TRANSITRON ELECTRONIC
CORPORATION, Plaintiff,

v.

HUGHES AIRCRAFT COMPANY,
Defendant.

Civ. A. No. 70–484–MA.

United States District Court,
D. Massachusetts.

Feb. 22, 1980.

Louis Orenbuch, Wolf, Greenfield & Sacks, Boston, Mass., for plaintiff.

John Hally, Nutter, McClennon & Fish, Boston, Mass., for defendant.

## OPINION

MAZZONE, District Judge.

### Statement of the Case

The plaintiff is Transitron Electronic Corporation (Transitron), a Delaware corporation, with its principal place of business in Wakefield, Massachusetts. The defendant is Hughes Aircraft Company (Hughes), a Delaware corporation, with principal offices in California, and with a regular and established place of business in Massachusetts.

The springboard for this case is the decision in *General Instrument Corp. v. Hughes Aircraft Co.*, 399 F.2d 373 (1st Cir. 1968). That decision held that the essential claim of the subject Hughes diode patent was invalid because the claim introduced new matter not supported by the original disclosure. Following that decision Transitron demanded the return of royalties paid under the licensing agreement. Failing in that effort, Transitron commenced this suit.

Transitron charges in Count I a violation of federal antitrust laws. This count is based on allegations that Hughes fraudulently obtained a patent for a glass sealed diode from the United States Patent Office. Transitron claims Hughes used this patent, allegedly invalid because of the fraud, and also because of Hughes' failure to comply with the Invention Secrecy Act, 35 U.S.C. §§ 181–188, to coerce Transitron (and other diode manufacturers) to enter a licensing agreement. It is alleged this action by Hughes was, first, an attempt to restrain trade in the diode market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and, second, an attempt to monopolize the diode market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Count II and Count III are based on the same factual allegations and sound in tort and contract respectively. Transitron seeks to recover treble damages for the antitrust violations and seeks return of the royalties paid under the invalid patent on either a patent misuse tort claim or breach of contract claim.

Hughes denies the allegations of any fraudulent conduct, denies violating the Invention Secrecy Act, and relies on applicable statutes of limitations. Further, Hughes counterclaims, alleging that Transitron fraudulently concealed its manufacture of diodes covered by the licensing agreement. As a result of this fraudulent misrepresentation, Hughes claims it is entitled to additional royalties.

*Background of the Case*

Most of the factual background of the case pertaining to Hughes' prosecution of the diode patent in the United States Patent Office and in Great Britain and to the communications between the parties is undisputed and is contained in the extensive documentary record. In order to understand and analyze more fully the legal theories advanced by the parties, we make our preliminary findings as to the factual background of this controversy at the outset.

The original patent application for a "Glass-Sealed Semi-Conductor Crystal Device" was filed on March 31, 1950, by Harper Q. North and Justice N. Carman, Jr. North and Carman assigned their interest in the patent application, Serial No. 153102, to Hughes Aircraft Company. The application was filed by Nicholas T. Volsk, Patent Counsel of Hughes. As filed, there were thirty-four claims. The invention related to germanium crystal conductive elements mounted in glass-sealed envelopes. It purported to disclose novel crystal device assemblies. Generally, the purpose of the invention was to produce semi-conductor crystal devices mounted in glass envelopes which would expand negligibly in response to temperature changes, thereby producing devices with stronger, more stable and superior electrical characteristics. The novel method of assembling such devices included the use of protective coatings to establish glass to glass seals, thus avoiding the use of high temperatures. This had not been possible under the prior art because the process for sealing the glass envelope necessarily required a high temperature which would damage the crystal.

There followed a vigorous and extended patent prosecution, in which a number of attorneys of the Hughes Patent Department took part. The personnel as well as the leadership of the Department changed during that period of time. Three additional claims were filed on September 20, 1950 making a total of thirty-seven claims. Claims 38–72 were filed on March 20, 1951; claims 73–81 were filed on May 19, 1951. Further amendments were filed periodically through July 12, 1954.

On March 10, 1952, while the application was pending, Hughes' Patent Department received a Description of Invention from Harper Q. North. This invention related to improving the diodes and the method for making them. Essentially, the new method involved fusing one end of the glass envelope before inserting the germanium crystal and then mounting the crystal through the use of a thermosetting compound and the application of relatively low temperatures. Inquiry was made as to the preferred composition of the thermosetting compound. Hughes contemplated the use of a gold thermosetting compound manufactured by DuPont, but investigated the possibilities of others on which it might have been able to obtain patent coverage. Hughes had put this new method into production sometime in early 1952.

On March 8, 1954, Hughes submitted claims 100–104 as an amendment to its application, purporting to recite the invention and process previously claimed in greater detail. These claims were disallowed. On July 27, 1954, Hughes submitted another proposed amendment which rewrote the previously disallowed claim 102 as claim 105 and claim 106. These last two claims were allowed on September 2, 1954 and renumbered claims 60 and 61. These claims deal explicitly with the structural and dimensional features of the diode and make no reference to the use of a thermosetting compound. On November 9, 1954, the patent was issued, U.S. Patent No. 2,694,168.

During the course of the patent prosecution, Hughes submitted a total of 106 claims. Those claims reflected continuing developments in the manufacture of semi-conductor diodes that occurred after the initial filing of the application. The developments related not only to the manner in which the glass enclosure was hermetically sealed, but to the structural support for elements within the enclosure. Claims 105 and 106 specifically called for the length of the seal between each of the lead wires and the respective end sections to be at least 1½ times the maximum cross sectional dimen-

sion of the wire, and the outside dimension of each of the end sections to be at least five times the cross sectional dimension of the lead wires. This disclosure explicitly recited the measurements which the drawings submitted in connection with the original application had reflected. While the drawings are not necessarily made to scale, they are an integral part of the application and are considered by the examiner in his review of the application.

In Great Britain, a patent application for the invention was filed on March 20, 1951 and issued on November 24, 1954, No. 721,-201. The material disclosed in claims 60 and 61 of the final United States patent was not filed in Great Britain as a claim under the parent patent, but instead was treated as a separate improvement in an application for a British Patent of Addition (the BPA) filed on November 8, 1954. Because the time for filing these claims under the parent patent had expired, it was necessary to file a patent of addition to the Patent # 721,201. The responsibility for this prosecution was assigned to Seymour Scholnick. Scholnick had not been involved with the patent prosecution in the United States. Under the guidance of British patent counsel, Carpmaels and Ransford, the claims, drawings, and prescribed preamble were filed. Carpmaels and Ransford had also filed the parent patent application.

In April, 1957, Hughes began an active industry-wide licensing program. Hughes had initially contacted Transitron about possible infringement in 1954, but Transitron refused to take a license in 1955 and Hughes did not pursue the matter. After some investigation over the next several years, Hughes determined that a number of manufacturers were infringing its patent. It sent notices to many of them, including Transitron charging infringement of claims 60 and 61. Hughes offered Transitron and others a non-exclusive license at a royalty rate of 1%.

On June 1, 1962, Transitron and Hughes executed a five year license agreement granting Transitron a non-exclusive right to manufacture diodes covered by claims 60 and 61 of the patent in exchange for a 1% royalty fee and for licenses under patents held by Transitron. The agreement contained a provision that a certified public accountant designated by Hughes could audit Transitron's records. Transitron manufactured under this license until October 1, 1962 when it switched to an "etched lead" diode construction and manufacturing process. Transitron notified Hughes that it was no longer manufacturing diodes within the Hughes patent and terminated royalty payments. As required by the 1962 agreement, Transitron periodically verified to Hughes between 1963 and 1966 that it was not manufacturing diodes covered by Hughes' patent.

In 1966, Hughes discovered that Transitron had abandoned its "etched lead" diode and was again manufacturing diodes covered by the license. Hughes demanded back royalties. After extensive negotiations, Hughes and Transitron agreed that Transitron would pay a lump sum of $150,000 for the infringing diodes it had manufactured between 1963 and 1966 and would renew its license agreement. Hughes did some independent investigating but did not perform an audit, although it had a right to do so under the license agreement. Transitron continued to manufacture diodes under the Hughes patent for several months until it switched to another of its own manufacturing techniques, the "mini-pack" diode.

Finally, to complete the background of this case, Hughes brought a patent infringement action against General Instrument Corporation in the District of Rhode Island. *Hughes Aircraft Co. v. General Instrument Corp.*, 275 F.Supp. 961 (R.I.1967). Hughes alleged claims 60 and 61 of the North-Carman patent had been infringed by General Instrument. Hughes was successful in the District Court. On appeal, the Court of Appeals for the First Circuit reversed, and held that claim 60 was new matter, not supported by the original disclosure in the North-Carman patent applica-

tion, in violation of 35 U.S.C. § 132.[1] On July 18, 1968, claim 60 of the patent was declared invalid. *General Instrument*, 399 F.2d at 380.

### Theories of the Case

We follow the background findings with our analysis of the theories advanced by the parties.

### 1. The Antitrust Claim Theory

■ Although issuance of a patent confers a seventeen year monopoly on a patentee, it does not absolutely exempt the holder from liability under the antitrust laws, 15 U.S.C. §§ 1–15. A patentee may violate those laws either in obtaining the patent by means of fraud on the Patent Office or in unlawfully enforcing its patent.

■ Plaintiff's allegations of antitrust violations are premised entirely upon its allegations of fraud on the Patent Office. Thus, the case falls squarely within *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). To make out a Sherman Act violation by fraud on the Patent Office, a plaintiff must first prove fraud, and then must prove all the other elements of an antitrust offense, including an agreement under Section 1 (conspiracy) or monopolistic intent, definition of the relevant market and exclusionary market power under Section 2. *Walker Process* at 176, 86 S.Ct. at 349.

■ Fraud on the Patent Office may be "actual" with a specific intent to defraud, or "technical" where "calculated recklessness about the truth" supplies the scienter element. *W. R. Grace & Co., Inc. v. Western U.S. Industries, Inc.*, 608 F.2d 1214 (9th Cir. 1979); *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*, 507 F.2d 288 (9th Cir. 1969). A very high standard of proof has been estab-

lished for either type of offense. Transitron must present clear and convincing evidence of (1) the falsity of Hughes' representations; (2) Hughes' fraudulent state of mind or wanton recklessness; and (3) materiality of the misrepresentations to the Patent Office's decision to issue the patent. *Johnson & Johnson v. W. L. Gore & Associates, Inc.*, 436 F.Supp. 704, 732 (D.Del.1977); *see, Norton Co. v. Carborundum Co.*, 530 F.2d 435, 444 (1st Cir. 1976); *United States v. American Bell Telephone Co.*, 167 U.S. 224, 251, 17 S.Ct. 809, 814, 42 L.Ed. 144 (1897).

The plaintiff's entire theory of this aspect of the case depends upon a finding that fraud was practiced on the Patent Office. Plaintiff alleges the following fraudulent acts and conduct of the defendant:

(1) Hughes' patent attorneys knew that claims 60 and 61 actually encompassed new matter, but intentionally withheld that information from the Patent Office.

(2) Hughes' patent attorneys intentionally misled the Patent Office by claims that the diode covered by the North-Carman patent had met with commercial success.

(3) Hughes' patent attorneys wilfully concealed from the Patent Office the fact that it was the "new" diode which met with commercial success.

(4) Hughes' patent attorneys wilfully concealed from the Patent Office that the ratios specified in claims 60 and 61 were intended to cover diode specifications adopted by the military after the initial patent application was filed.

We can find no direct evidence that Hughes knew claims 60 and 61 contained new matter and fraudulently obtained the patent, but Transitron urges us to infer such knowledge from evidence of the following conduct. First, the subject matter

---

1. Both the District Court and the Court of Appeals directly addressed only claim 60, finding

that claims 60 and 61 were nearly identical. 275 F.Supp. at 964.

of claims 60 and 61 constitutes such a radical departure from the original disclosure that Hughes' patent attorneys must have recognized that the claims contained new matter. Secondly, Hughes knew of a modification by Harper Q. North that was made after the filing of the original application and Hughes may have contemplated filing a "Continuation in Part" (CIP) patent application or a wholly independent application for the modification, then without apparent reason, instead filed amendments relating to the modification under the original patent. Thirdly, Hughes claimed commercial success for the diode which was not covered by the original application. Finally, the subject matter was treated as new matter in Hughes' prosecution of the patent of addition in Great Britain.

Transitron's second theory of antitrust violation is that even if the patent was not obtained by fraud on the Patent Office, Hughes violated the Invention Secrecy Act, 35 U.S.C. § 184, by failing to obtain a license from the United States Patent Office to file the British Patent of Addition. Transitron asserts that such a violation would invalidate the patent *ab initio* under 35 U.S.C. § 185, that Hughes knew or should have known of the violation and resultant invalidity, and that its licensing program was, therefore, an attempt to enforce a patent known to be invalid, which may constitute an antitrust violation. *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986 (9th Cir. 1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980).

A patentee may also violate the antitrust laws by enforcing a valid patent in an unlawful manner. *See, e. g., Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir.), *cert. denied,* 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952) (patentee engaged in scheme to monopolize by acquiring all patents within industry and publicizing its very vigorous infringement litigation); *Rex Chainbelt Inc. v. Harco Products, Inc.*, 512 F.2d 993 (9th Cir.), *cert. denied,* 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975) (infringement suit "brought in furtherance and as integral part of a plan to violate the antitrust laws," 512 F.2d 1006); and *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), *on remand* 360 F.Supp. 451 (D.Minn.1973), *aff'd mem.*, 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974) ("repetitive use of litigation . . timed and designed principally to . . . preserve defendant's monopoly," 360 F.Supp. 451.) Although Transitron has not specifically pleaded any particular patent antitrust violation apart from fraud on the Patent Office or enforcement of a patent known to be invalid, we shall examine the evidence for proof of such a violation.

### 2. The Patent Misuse Claim Theory

 Patent misuse is generally set up as a defense to an infringement suit. It is similar to an allegation of a patent antitrust violation in that it asserts the patentee is wrongfully attempting to enforce the patent, either because the patent was fraudulently obtained or because the enforcement methods are unlawfully anticompetitive. Patent misuse requires a lesser showing than a Sherman Act violation in that a licensee who asserts it need prove neither anticompetitive effects, *Noll v. O. M. Scott & Sons Co.*, 467 F.2d 295 (6th Cir. 1972), *cert. denied,* 411 U.S. 965, 93 S.Ct. 2143, 36 L.Ed.2d 685 (1973), nor individual harm, *Morton Salt Co. v. G. S. Suppiger Co.*, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). Patent misuse may be shown from the totality of a licensor's conduct and business practices. *Duplan Corp. v. Deering Milliken, Inc.*, 444 F.Supp. 648 (D.S.C.1977), *rev'd in part on other grounds*, 594 F.2d 979 (4th Cir. 1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 666, 62 L.Ed.2d 645 (1980). Thus, patent misuse may be seen as having a less stringent standing requirement and a lesser burden of proof than an antitrust claim. This is consistent with the general policy of the courts to erect barriers which prevent the frustration of patent law by antitrust law and its highly punitive treble damage provisions, but at the same time to relieve a licensee from paying royalties under a pat-

ent which is unlawfully obtained or enforced. *Handgards*, 601 F.2d at 996.

■ The threshold issue on plaintiff's patent misuse claim is whether patent abuse by a licensor can give rise to a tort action by the licensee. This is apparently a question of first impression. All the patent misuse cases we have been able to find involve the assertion of the doctrine by a licensee as a defense to a licensor's infringement action rather than as grounds for affirmative relief. On the basis of the history and application of the doctrine, and the availability of other grounds on which plaintiff licensees may seek damages in the context of patent misuse, we conclude that patent misuse of itself is not an actionable tort.[2]

■ Patent misuse was developed as an equitable doctrine to provide an equitable defense, analogous to the clean hands defense, against an infringement action. Chisum, Patents, p. 19–91 (1978). A patentee may commit patent misuse in improper exploitation of the patent either by violating the antitrust laws or extending the patent beyond its lawful scope. *Id.* That the doctrine does not create an independent cause of action for the alleged infringer is implicit in the black letter statement of the effect of finding patent misuse: "Misuse of a patent merely suspends the owner's right to recover for infringement of a patent." *Id.* at 19–156. The courts have uniformly held that the owner's right to recover for infringement is reinstated once the offensive practice has been abandoned and its effects have been purged. *Id.*

The doctrine was first clearly enunciated by the Supreme Court in *Morton Salt*, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, where the patentee's improper exploitation of its patent was sufficient to bar its attempt to collect royalties, regardless of whether the allegedly infringing defendant could show

individual harm or whether the offensive conduct was sufficient to constitute an antitrust violation. In *Transparent-Wrap Machine Corp. v. Stokes & Swift Co.*, 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563 (1947), the Supreme Court held that a license provision requiring that the licensee "grant back" all its own patents to the licensor might constitute patent misuse and bar the enforcement action. In *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 133–140, 89 S.Ct. 1562, 1581–1585, 23 L.Ed.2d 129 (1969), the Court found patent misuse in the terms of a license which based royalties on a percentage of gross sales without regard to the licensee's actual use of the patent.

■ The Supreme Court refined the doctrine in *United States Gypsum Co. v. National Gypsum Co.*, 352 U.S. 457, 77 S.Ct. 490, 1 L.Ed.2d 465 (1957), holding that patent misuse might be "purged" so that the patentee's right to enforce its protected monopoly was reinstated. Thus, the doctrine provides only a temporary defense to a suit for royalties. This supports our conclusion that it does not create an independent right to recover the back royalties which a licensee has chosen to pay. Because the doctrine of licensee estoppel was put to rest in *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969) (overruling *Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.*, 339 U.S. 827, 836, 70 S.Ct. 894, 899, 94 L.Ed. 1312 (1950)), a licensee is free at any time to refuse to make further royalty payments and successfully defend against enforcement on grounds of patent misuse. Therefore, a licensee waives a potential patent misuse defense insofar as it pays royalty fees.

### 3. The Contract Claim Theories

■ Plaintiff's Count III seeks recission of the license agreements and restitution of royalties on two theories. Transitron first

2. *E. g.*, actions for unfair competition, *Tubeco, Inc. v. Crippen Pipe Fabrication Corp.*, 402 F.Supp. 838 (E.D.N.Y.1975), *aff'd mem.*, 538 F.2d 314 (2nd Cir. 1976), for antitrust violations or for breach of the license agreement.

argues that Hughes' false and misleading representations to the Patent Office as reflected in the file wrapper were material misrepresentations which induced Transitron to take a license. To entitle a party to rescind a contract on the grounds of fraudulent misrepresentation in the inducement under Massachusetts law, proof of fraud must be clear and convincing. *Sanborn v. Stetson*, 2 Story 481, 485 (C.C.S.D.Mass. 1843); *see, Norton v. Carbundum*, 530 F.2d at 444. "Fraud is not presumed. It must at law be clearly and fully established. Suspicion is not enough. The balance of the testimony is not to be nicely weighed." *Sanborn* at 485. Alternatively, Transitron argues that the parties' belief that claims 60 and 61 were valid constituted a mutual mistake of fact.

 Overriding patent law policies make restitution generally unavailable for royalties paid under a patent later held to be invalid. *St. Regis Paper Co. v. Royal Industries*, 552 F.2d 309 (9th Cir.), *cert. denied*, 434 U.S. 996, 98 S.Ct. 633, 54 L.Ed.2d 490 (1977). Otherwise, all licensees under a certain patent would get a "free ride" from one infringer's decision to litigate rather than pay royalties. Absent fraud or other conduct by the licensor justifying punitive treatment, a determination of patent invalidity does not make a license agreement void *ab initio*. *Troxel Manufacturing Co. v. Schwinn Bicycle Co.*, 465 F.2d 1253, 1260 (6th Cir. 1972), *cert. denied* 416 U.S. 939, 94 S.Ct. 1942, 40 L.Ed.2d 290 (1974) (*Troxel I*). Whenever a licensee doubts the validity of a patent, it is free to withhold royalty payments and is not estopped from raising invalidity as a defense to an infringement or breach of contract suit. *Lear*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). Therefore, a "mutual mistake" as to the validity of the patent does not affect the validity of the licensing agreement. We note the mutual mistake theory assumes Hughes' good faith belief in validity at the time of licensing, a premise which flies in the face of Transitron's factual allegations throughout this litigation.

 The material misrepresentation theory fails because it does not appear that Transitron investigated the file wrapper before taking a license. Therefore, there was no direct reliance by Transitron on any false and misleading statements or non-disclosures contained therein. Transitron's injury resulted from its reliance upon the Patent Office to make a correct determination of validity. *Pepsi-Cola Metropolitan Bottling Co. v. Pleasure Island, Inc.*, 345 F.2d 617 622 (1st Cir. 1965) (applying Massachusetts law).

### 4. Hughes' Counterclaim

On November 9, 1971, after Transitron filed this antitrust action, Hughes counterclaimed for royalties under the 1962 agreement for infringing diodes manufactured by Transitron between 1963 and 1966. Hughes argues that the $150,000 lump sum and renewed royalty agreement it received as payment for past infringement in the 1966 settlement does not constitute accord and satisfaction because Hughes accepted the settlement in reliance on Transitron's misrepresentations as to the quantity of patented diodes it manufactured between 1963 and 1966.

 Although it is presently asserting a claim under an invalid patent, Hughes is not barred from asserting its counterclaim by the doctrine of patent misuse. It is asserting a claim for royalties due before the patent was held invalid. Thus, it is not attempting to enforce an invalid patent. In *Troxel Manufacturing Co. v. Schwinn Bicycle Co.*, 489 F.2d 968 (6th Cir. 1973), *cert. denied*, 416 U.S. 939, 94 S.Ct. 1942, 40 L.Ed.2d 290 (1974) (*Troxel II*), the Sixth Circuit allowed a licensor's counterclaims, holding that a licensee may not avoid liability for royalties due before a declaration of invalidity when that declaration is obtained by the efforts and expenditures of another:

> It is only when, by judicial decree or otherwise, it is published to the world that the monopoly is destroyed, that the licensee can claim a corresponding release from his obligation to pay royalties.

*Troxel II*, 489 F.2d at 973, *quoting Drackett Chemical Co. v. Chamberlain Co.*, 63 F.2d 853, 854 (6th Cir. 1933).

Hughes must prove it relied on Transitron's misrepresentations in order to rescind their settlement agreement. *Pepsi-Cola Metropolitan Bottling Co.*, 345 F.2d at 622. Absent such a showing, performance of the agreement whereby each party compromised its position operates as accord and satisfaction of the unliquidated claim to royalties due between 1964 and 1966. *Rust Engineering Co. v. Lawrence Pumps, Inc.*, 401 F.Supp. 328, 333 (D.Mass.1975).

The questions we decide, therefore, are whether Transitron made willful and material misrepresentations for the purpose of deceiving Hughes, whether Hughes reasonably relied upon them, and, if so, whether any reason exists to deny recovery of further royalties at this time.

### General Findings
#### Plaintiff's Case

I. Hughes did not procure the North-Carman Patent through fraud on the United States Patent Office.

II. Hughes was not required to secure a license for filing the British Patent of Addition.

III. Hughes did not use its patent in an effort to eliminate competition and restrain trade, nor did Hughes use its patent in an attempt to create a monopoly.

IV. Hughes' conduct did not constitute patent misuse.

#### Defendant's Counterclaim

V. Transitron knowingly made misrepresentations to Hughes concerning its infringing production.

VI. Hughes did not rely on Transitron's misrepresentations.

VII. Hughes failed to fulfill its obligations to the Patent Office.

### I. HUGHES DID NOT PROCURE THE NORTH–CARMAN PATENT THROUGH FRAUD ON THE UNITED STATES PATENT OFFICE.

Transitron urges us to infer Hughes' fraudulent intent from four aspects of the patent prosecution: (A) The scope of claims 60 and 61 was so different from the underlying disclosure that Hughes did realize or should have realized they contained new matter; (B) Hughes initially planned to file a CIP application for the patent disclosure by Harper Q. North (P.D. 437), reflecting a recognition that the subject matter was new. Its subsequent decision to file amendments was intended to hide a lack of identity of inventorship; (C) Hughes knew the commercially successful diode was not covered by the original application and had been in commercial use for more than one year; and (D) Hughes' treatment of the content of PD 437 and claims 60 and 61 as new matter in its British patent prosecution reflected a recognition of novelty. We examine each of these aspects of the prosecution individually and then in the aggregate to determine if the totality of Hughes' conduct amounted to fraud.

#### A. Scope of Claims 60 and 61.

The initial claims and claims 60 and 61 describe a crystal diode, with a semi-conductor element or chip mounted inside a hermetically sealed glass envelope. One wire is fixed to the chip by means of a conductive vitreous paste. A wire "whisker" serpentines down from the other lead wire inside the envelope and touches but is not attached to the chip, establishing a "point contact." One production problem addressed by the invention was avoiding damage to the electrical characteristics of the chip from the heat applied to seal the envelope. The invention also addressed the problem of designing the diode in such a way that the glass would not crack when heated or when the external ends of the wires were bent. Thus, the patent covered a particular configuration or package for a

crystal diode and a method for manufacturing the package so as to make it rugged and electronically reliable.

The Court of Appeals found in *General Instrument* that claim 60 contained new matter in the following respects:[3]

(1) in the original drawings the chip was supported by being embedded in the bottom of the glass envelope; in claims 60 and 61 it is supported only by the lead wire to which it is attached.

(2) in the original claims, one of the lead wires was composed of two pieces of different diameters; claims 60 and 61 reflect a one-piece lead of constant diameter.

(3) the original application only illustrated by drawing certain outer dimensions of the glass package and certain ratios among its parts; those dimensions and ratios, which were critical to the commercial usefulness and ruggedness of the diode, are explicitly made normative in the later claims.

(4) the original application disclosed a manufacturing process whereby the semiconductive chip was exposed to extreme heat; although claims 60 and 61 disclose only a completed product, the process employed by Hughes and discussed at length in the BPA and internal Hughes documents for making that product is a process whereby the chip is exposed to one low temperature seal.

As additional difference not discussed in *General Instrument*, but argued here, was the re-entrant configuration of the glass to glass seals of the later diode. The drawings submitted with the original United States patent application depict an angle between the lead wire and the end of the glass

envelope greater than 90°, so the package has sloping "shoulders." (Figure. 1). The drawings submitted with the BPA, which reflect the substance of claims 60 and 61, depict a "re-entrant" configuration, with an angle of less than 90° between the lead and envelope. (Figure 2). The re-entrant configuration results from the new method of sealing the package described in North's invention disclosure (see Part IB, *infra*) and the preamble to the BPA, which was put into production in the spring of 1952.

FIGURE 1

3. We need not here reiterate the Court of Appeals' comprehensive technical analysis. *See* 399 F.2d 373. Of course, we do not decide here whether these changes are new or simply noninventive changes in manufacture. We need only decide whether the changes were proposed as amendments by Hughes' patent attorneys with the knowledge that they were new and with a calculated effort and intent to deceive the Patent Office, or with reckless disregard of their novelty.

FIGURE 2

manufacturing improvement he disclosed (*see* Part IB, *infra*) but he made no reference to the re-entrant configuration which happened to result from the new sealing methods. If the re-entrant configuration was a significant improvement to, and modification of the diode, we find it was wholly unintentional.

We cannot say on the basis of the four factors discussed in *General Instrument* plus the re-entrant configuration that Hughes knew or should have known that claims 60 and 61 contained new matter and deliberately withheld that knowledge from the Patent Office. Our review of the hundreds of exhibits, the depositions, and the testimony that comprise the record in this case leads us to conclude that Hughes' Patent Department wrote those claims in as broad a fashion as possible in order to gain the most extensive coverage for its patent. While the original application did not state the dimensions found critical in *General Instrument*, support for these dimensions could be found in the drawings. The ultimate decision as to novelty of subject matter was that of the Patent Examiner who accepted the claims. Patent coverage depends on patent claims. They define the scope of the invention. The prosecution of a patent application primarily involves working out acceptable wording of claims to be clear of prior art and to comply with statutes and rules. Initial rejection of all claims is so commonplace as to be without legal significance. There is a constant struggle that goes on between the attorney who seeks maximum protection for a client's invention and the examiner who raises all possible legal and technical objections. The result is a set of protected claims.

We also find support for our conclusion in the file wrapper. It discloses every aspect of this aggressive prosecution, including the resistance of the Patent Office to the number of claims, which it considered unduly great. We note that in January, 1952, early in the prosecution, the claim of radiant heat sealing was rejected and the applicants were advised to desist from presenting such a claim. Hughes felt that the prosecution

Transitron asserts that the re-entrant configuration was a significant departure from the original construction because with the smaller angle, much less stress was exerted on the end of the glass package when the lead wire was bent, so the glass was much less likely to crack where the wire entered and was sealed to the envelope.

We attach little significance to the re-entrant configuration for several reasons. First, there was conflicting testimony as to whether cracking around the very ends of the envelope impaired the hermetic seal. Secondly, there was conflicting testimony as to whether a re-entrant configuration would reduce such cracking. Finally, North discussed in detail the advantages of the

was undergoing a haphazard examination in the Patent Office and pursued its claim. The claims eventually allowed as claims 60 and 61 were never rejected as unsupported. They were rejected as covered by prior patents, such as Midgley. It was not until Henry Heyman took over the prosecution that the claims were allowed. Heyman admittedly undertook to write the claims in the broadest terms that the Patent Office would allow. In our view, this successful course of action cannot be attributed to willful concealment and deception. The Patent Office accepted the claims after much review and refinement of the application. There is no evidence that any of the Hughes patent counsel who worked on the prosecution believed the claims were novel but persisted in this effort to gain patent coverage by deliberately concealing that novelty from the examiner.

We are also aided by the testimony of Harper Q. North in finding that Hughes did not believe claims 60 and 61 were new inventions. The invention was the diode. North considered the claims to be engineering improvements, merely a way to improve the production yield by changing the manufacturing process. They did not necessarily describe a better diode, just a diode that was cheaper to make. Even the re-entrant configuration, relied upon so heavily by Transitron to demonstrate novel matter, was not critical as far as North was concerned. He felt the glass which encased the lead could crack off and not affect the seal in any way.

We also accept the testimony of David Doody, Director of Patents at Hughes beginning in 1957. Doody was not at Hughes during the original prosecution. We found him to be candid and helpful. Doody reviewed all of the material submitted by the manufacturers included in the proposed licensing program, particularly the comprehensive report of Raytheon patent counsel. That material focused on two reasons the claim was not valid, namely that the process was in use more than one year, and that claim 60 was not supported by the specifications. It was Doody's judgment that claims 60 and 61 were not new matter, a judgment

confirmed by outside counsel as well as by a staff who were not present during the time of the prosecution. He persisted in his licensing program to gain respect for the patent. He negotiated the settlement with Transitron counsel. He consistently maintained the position that claims 60 and 61 did not involve new matter and that Hughes made a complete disclosure in the original application. The institution of the suit against one of the diode manufacturers who resisted the license, General Instrument Corporation, was an action which is consistent with his announced intention in pursuing the licensing program.

### B. *North's Invention Disclosure.*

On March 7, 1952, Harper Q. North submitted to the Hughes Patent Department a "Description of Invention" # PD 437. Entitled "A Point Contact Diode of Improved Construction," PD 437 names only North as the inventor, refers to the pending United States patent application as "related," and contemplates that the invention would be for sale as of February 17, 1952. North's disclosure does not recite any of the dimensional features of claims 60 and 61, but deals with the use of thermosetting paste to mount the chip on the lead wire and with the low temperature sealing process.

On April 3, 1952, Hughes' patent attorney Rosenberg wrote to the DuPont Corporation concerning DuPont's gold thermosetting paste. He stated that "Hughes Aircraft Company has recently started production of an improved germanium diode . . . ." and that he was "[i]n the course of preparing a patent application on the improved diode . . . [.]"

On May 22, 1952 North conferred with attorneys Lentz and Rosenberg. PD 437 was described as "a disclosure which related to the use of a conductive thermosetting compound for mounting a semi-conductor crystal" with "rather tenuous" patentability. However, they contemplated filing some form of patent application covering use of the compound in a glass diode package as soon as possible.

On July 2, 1952, Volsk, Rosenberg, Lentz and North decided to "prosecute" PD 437. It is unclear whether they had decided how to prosecute it—as a new invention, as a CIP on the original invention, or as an amendment to the original invention.

On September 11, 1952, Lentz "decided to withhold action on the application of the subject matter contained [in PD 437] for at least another week or two" and not "to proceed further with the prosecution of this disclosure" because certain details of the manufacturing process had still not been ironed out. Again, it is unclear what form prosecution was to take.

The Patent Office indicated on July 27, 1954, that it would allow the claims finally issued as 60 and 61. On August 17, 1954, after discussing PD 437 with Hughes' Patent Evaluation Committee of the Semi-Conductor Division, Lentz closed the PD 437 file without "prosecution into a patent application" because of several problems with the patenting of the gold thermosetting paste, which he viewed as the gist of PD 437. He noted that references to thermosetting compounds in the original patent application were sufficiently broad to cover that aspect of PD 437. Finally, he noted that an earlier Hughes patent application provided coverage because it disclosed a method of fusing and mounting a crystal, although it was a silicon crystal. That application, dated May 10, 1954, was entitled "Fused-Junction Silicon Diode."

Transitron argues that Hughes contemplated filing an application for a CIP on PD 437. A CIP is a procedure for patenting an improvement on or modification to an invention on which an application is already pending, rather than for clarifying the originally disclosed invention. 35 U.S.C. § 120. The improvement or modification disclosed in a CIP must have inventorship identical to that of the parent patent. *Id.; see also, Hinde v. Hot Sulphur Springs, Colorado,* 482 F.2d 829 (10th Cir.1973). We are asked to infer that because North appears to have been the sole inventor of the process in PD 437, Hughes at some time realized it could not obtain a CIP and instead contrived to

protect as much as possible of PD 437's new matter in the form of amendments.

First, North's testimony that the disclosure was of an "improved construction" bears on the intent of the participants in the prosecution at this point. North submitted it as an engineering improvement and left the patent possibilities to the evaluation of the attorneys in the Patent Department. He was concerned with the improvement of the bond and the sealing process. The file wrapper contains numerous references to the use of a thermosetting paste or "slurry," indicating to us some semi-solid mixture. The file wrapper refers to a silver paste, but its function would be the same. Hughes had investigated the possibility of utilizing compositions other than the DuPont gold compound, such as rhodium, titanium and platinum.

North's diary provides further support for our conclusion that PD 437's process change, namely, the use of the thermosetting paste and sealing the envelope before inserting the crystal, need not have been viewed by Hughes as a significant departure from the original disclosure so as to warrant a CIP application. North's and Carman's search for a better diode never stopped. Soon after the original application was filed in March, 1950, Hughes' production department was encountering problems due to the heat seal. As early in the patent prosecution as June, 1950, the sealing difficulty led to consideration of discontinuing the use of silver paste. In July, 1950, rhodium was tested and a different DuPont composition, # 5275, was employed in the process with excellent results in one phase, but led to other problems. In August, 1950, only five months after filing, "bad diodes" were traced to instances where the crystal was supported by glass or where the paste was porous. There was not yet any large scale manufacture of the diode as originally described. A test change in the process in October, 1950, resulted in the re-entrant configuration, with which the glass ends would not crack when the leads were bent.

Throughout 1951, difficulties due to heat sealing continued. In August, 1951, Carman, the co-inventor, still employed by Hughes, was working to develop a sealing process at a low enough temperature to avoid damage to the crystal. While North was obviously the major figure, Carman was still involved and was consulted on occasions. In February, 1952, Carman's ideas were the subject of experiments. Compounds with rhodium, platinum and gold were tested because the thermosetting silver paste had failed. Tests using thermosetting gold paste yielded average results. And as late as June, 1952, several months after PD 437 had been submitted, suggestions to thicken the paste by using additional gold powder were being investigated.

The history of this invention, from its conception through the submission of PD 437 and beyond, is one of continuing experimentation, testing and development concerned with problems in plating the semiconductor element and not breaking the glass envelope. The record reflects the evolution of the final device. Since heat was always a problem, a process had to be developed where there would be no bond between the crystal and the glass envelope. The vitreous bond was abandoned and the process employed a thermosetting substance to bond the crystal to its support. The original packaging process of the patent was changed by this disclosure in two respects: the crystal was inserted after the first seal was made and gold paste was used rather than some other conductive paste. The dimensions, always present in the drawings but not specified, now became important because they related to heat and strength and consequently the manufacturing process was affected. The co-efficients of expansion were critical in the manufacture of the diodes but not in their use. The ratios contributed to the rugged, more reliable construction of the diode, but were not required for the electrical conducting performance of the diode. In short, these were not sudden discoveries made years after the original disclosure, but reflected the process

of development throughout the life of the prosecution.

We have already noted Hughes' belief that coverage of PD 437 was adequately secured by the original application as well as the subsequent application relating to the silicon crystal diode. We further note that on October 22, 1952, North, Rosenberg and Lentz conferred regarding another patent disclosure, PD 458. This disclosure related to a hermetically sealed diode in which a crystal was mounted on a copper block to dissipate heat generated in the crystal. Since they considered the method of attaching the crystal similar to that described in PD 437, action was deferred until a decision was made on PD 437. These events indicate to us the interrelationship of patent applications in the Hughes Patent Department and provide support for our finding that the Hughes lawyers and scientists had a good faith belief that these developments and modifications were improvements in the existing invention and were not new matter which required disclosure *as such* to the Patent Office.

C. *Commercial Use and Success.*

The subject matter of PD 437 was in commercial use in the first half of 1952, perhaps as early as February 17 according to PD 437. Clearly, the diode was advertised in The I.R.E. Bulletin of February, 1953. An invention may not be patented after it has been in commercial use for more than one year. 35 U.S.C. § 102(b). Therefore, an application for a separate patent would have had to have been filed by about February, 1953. Following a line of argument similar to the CIP rationale, Transitron asserts Hughes' decision to patent the commercially successful diode as an amendment was precipitated by its failure to meet that February, 1953 deadline. It finds support for this theory in the "Remarks" submitted by Hughes with its first filing of claims 60 and 61 (then 102 and 103) on March 8, 1954. Hughes then stated that it had then been "active" in selling the diodes for only nine months.[4] Transitron

---

4. We note that Rosenberg was the attorney who was prosecuting the claim at this time. A

Patent Office action had been issued on March 20, 1953. Rosenberg responded by an Amend-

argues the statement was a knowing misrepresentation designed to conceal that claims 60 and 61 would have been treated as new matter but for Hughes' failure to meet the filing deadline.

We do not equate the statement concerning "active" sales in light of Hughes' knowledge that diodes had been for sale for more than nine months with fraudulent intent to mislead the Patent Office. It appears to us that statements of commercial success are standard in patent prosecutions to demonstrate that an invention differs significantly from prior art. We are uninformed as to the definition of commercial success. Although Hughes may have adopted the process in its production line in 1952, the modified diode may not have been commercially successful immediately.

 Transitron also argues that Hughes' assertions in the patent prosecution that the initial design had achieved great commercial success were fraudulent because only diodes within claims 60 and 61, not those disclosed by the original patent, were commercially successful. Because we find Hughes believed 60 and 61 did read on the original disclosure, we must also find Hughes made its representations of commercial success in good faith. We further find that the statement as to Hughes' commercial success was not material to the examiner's decision to allow the claims. Transitron has produced no evidence of reliance by the examiner on that statement, nor can we conclude that the statement would influence the examiner's decision. Fraud on the Patent Office must be material in order to be actionable. *Johnson & Johnson*, 436 F.Supp. at 732. Hughes admitted it was employing the process

changes in its production lines, a fact known throughout the semi-conductor industry.[5]

### D. *Significance of the BPA.*

Hughes could not have filed the subject matter of claims 60 and 61 under the British parent patent because British patent law required that a patent application be put in order within one year of filing the complete specifications. Patents Act, 1949, 12, 13 & 14 Geo. 6, c. 87, § 12. Hughes could have introduced the material as an amendment after the main patent application had been accepted only for the purpose of correcting an obvious mistake. Patents Act, 1949, § 31. Because the claims described a diode so similar to that disclosed in the main patent, an application for an independent patent might well have been rejected for obviousness. A patent of addition is the appropriate way to protect an "improvement in or modification of an invention" when the applicant has filed for or obtained a patent on the main invention. Patents Act, 1949, § 26(1). Therefore, Hughes could best protect the subject matter under a patent of addition. In order to obtain a patent of addition, the claims had to disclose "novel" matter not disclosed in the specification relating to the main invention. T. Terrell, Law of Patents, § 138 (12th ed. 1971).

Transitron asks us to infer from the fact that Hughes' British patent prosecution treated the subject matter of PD 437 as new material that Hughes was aware that the subject matter was new. The language of the only two claims of the BPA, claims 1 and 2, is virtually identical to claims 60 and 61, but the BPA also includes a three-page

---

ment dated September 16, 1953. Without waiting for a reply, Rosenberg filed the "Supplemental Amendment" dated March 9, 1954, which contained the "incriminating" statements. We question if he intended that the supplemental amendment relate back to the September 1953 amendment. If so, it might serve to explain the "nine months" statement since the I.R.E. Bulletin advertising the diode was issued in February, 1953.

**5.** As we did earlier in advising that we were not deciding that claims 60 and 61 were non-inventive matter, we again do not decide that claims 60 and 61 would fail for late filing. That is not at issue here. The issue here is whether Hughes, with knowledge that the time for filing had expired, conducted its patent prosecution fraudulently to conceal the new matter from the Patent Office and capture patent protection to which it was not entitled.

preamble describing the problems with the original manufacturing process and the improvements on that process disclosed in PD 437, specifically use of the gold thermosetting compound and a low temperature seal.

We rely on the correspondence between British patent counsel and Hughes to form our conclusion that Hughes' British patent prosecution does not bear on the issues of this case. As we have noted earlier, the responsibility for the prosecution of the British patent of addition was assigned to Seymour Scholnick, an attorney who had no involvement with the prosecution in the United States. It is clear he relied upon claims 60 and 61 to write claims 1 and 2 because they are identical except for minor differences in describing the scope of dimensions. It is also clear that British patent counsel provided guidance for him. It was only upon the advice of British counsel that a preamble was drafted and submitted. Changes were made in the specifications after the filing. Scholnick had the benefit of all that was contained in the entire Hughes file when this application was filed in November, 1954. He continually referred to "improvements" in the "process" of making the diode, but did not claim an invention, in keeping with the British patent law. The final prescribed preamble was not filed until November 1, 1956, after there had been the normal exchange of correspondence between the British Patent Office and British patent counsel.

*Summary: Fraud*

█ Even when we view the above four aspects of Hughes' patent prosecution in totality, they are insufficient to convince us that Hughes knew claims 60 and 61 contained new matter when it filed them as amendments. We are mindful that the laws of agency apply, so that Hughes must be held to have known what each of its agents knew. *W. R. Grace*, 608 F.2d 1214. However, we cannot find the clear and convincing evidence that any Hughes employee knew or should have known claims 60 and 61 contained new matter that is necessary to establish fraud. We have no evidence that any member of the Hughes Patent Department ever opined that the claims contained new matter. We do not find that claims 60 and 61 are such a radical departure from previous claims that knowledge of their newness must be imputed to Hughes.

█ A patent attorney does have a duty to provide the Patent Office with a full disclosure of all aspects of the invention. *Monolith Portland*, 407 F.2d 288. However, the final decision as to whether a claim falls within the initial disclosure is a function of the Patent Examiner, not the attorney. Hughes' decision to treat the modified construction as an amendment, rather than as a CIP or separate patent, may have been influenced by its recognition that lack of identity of inventorship precluded a CIP and that the commercial use deadline had passed for an independent application, but those possible considerations do not amount to clear and convincing proof that Hughes knew the claims contained new matter.[6]

What constitutes new matter is a legal conclusion on which reasonable lawyers may differ in a close case. That this case was close is clear from the finding of validity by the District Court of Rhode Island in the first *General Instrument* case, 275 F.Supp. 961 (1967). Only after the BPA was disclosed did the Court of Appeals reverse that finding. That Court refrained from finding fraud in Hughes' prosecution of claims 60 and 61 and that Court did not have the benefit of the discovery over the ensuing years which we conclude supports Hughes' defense in this case. In the more than ten years which have elapsed since *General Instrument* was decided by the First Circuit, Transitron has failed to sustain its burden of showing any significant evidence of Hughes' fraudulent misconduct,

---

6. While we do not attach any significance to the fact in view of our conclusion, we note that Carman witnessed the program conducted by Elmo Maiden at Hughes of the successful testing of the gold thermosetting paste from DuPont from February 15 to March 14, 1952. Carman was employed by Hughes until May, 1954.

despite exhaustive discovery and the commendable efforts of trial preparation and presentations by the attorneys for both parties.

## II. HUGHES WAS NOT REQUIRED TO SECURE A LICENSE FOR FILING THE BRITISH PATENT OF ADDITION.

■■ Transitron argues that Hughes violated the Invention Secrecy Act, 35 U.S.C. §§ 181–188, by filing the BPA without first obtaining a license from the United States Patent Office, that the entire Hughes patent was, therefore, invalid *ab initio* under Section 185,[7] and that Hughes was aware of the invalidity when it demanded that Transitron take a license. Section 184 provided in pertinent part:

§ 184. Filing of application in foreign country.

Except when authorized by a license obtained from the Commissioner a person shall not file or cause or authorize to be filed in any foreign country prior to six months after filing in the United States an application for patent . . . in respect of an invention made in this country . . . .

The term "application" when used in this chapter includes applications and any modifications, amendments, or supplements thereto, or divisions thereof.

The American parent patent was filed more than six months before the British parent patent. Claims 60 and 61 were filed as 102 and 103 on March 8, 1954, more than six months before the BPA, are virtually identical to the BPA, and clearly constitute an "application" as that term is defined in

Section 184. Thus, Hughes was not required to obtain a license and did not violate the Act. The patent was valid for purposes of the Invention Secrecy Act, so in this respect Hughes could not have committed the antitrust offense of attempting to enforce a patent known to be invalid. We do not reach the question of whether a private right of action exists under the Act.

## III. HUGHES DID NOT USE ITS PATENT IN AN EFFORT TO ELIMINATE COMPETITION AND RESTRAIN TRADE, NOR DID HUGHES USE ITS PATENT IN AN ATTEMPT TO CREATE A MONOPOLY.

Although Transitron submitted some evidence concerning the diode market, Hughes' and Transitron's sales, and Hughes' licensing practices, it fell short of proving any type of patent-antitrust violation.

■■ Hughes had no overall scheme to monopolize the semiconductor or diode industry. The terms of Hughes' licenses did not "transcend what is necessary to protect the use of the patent or the patent monopoly." *Duplan*, 444 F.Supp. at 684, citing *Standard Sanitary Manufacturing Co. v. United States*, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107 (1912). Its royalty fee was 1% of gross sales for all licensees. That rate does not appear to have been excessive.[8] It was not high enough to prevent commercially successful manufacturing by many licensees. Nor does it appear that Hughes reaped unreasonable profits. Hughes did not fix its licensees' prices. It offered licenses to all comers on the same basis, and imposed no unreasonable restrictions. It did

7. "§ 185. *Patent barred for filing without license.*

"Notwithstanding any other provisions of law any person, and his successors, assigns, or legal representatives, shall not receive a United States patent for an invention if that person, or his successors, assigns, or legal representatives shall, without procuring a license prescribed in section 184 of this title, have made, or consented to or assisted another's making, application in a foreign country for a patent or for the registration of a utility model, industrial design, or model in respect of the invention. A United

States patent issued to such person, his successors, assigns, or legal representatives shall be invalid."

8. A royalty rate of 2½% established by a master was found by the Sixth Circuit to be too low in a case which involved similar circumstances in that there were no available non-infringing substitutes for the patented device and in that there was great competition among sellers of infringing devices. *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).

not demand grant back provisions or require licensees to take a license package including unpatentable information or unusable patents.

Nor were Hughes' enforcement suits and efforts to license, including threats of suit against Transitron, General Instrument, and others who manufactured under claims 60 and 61 baseless, repetitive litigation, given Hughes' belief that the claims were valid. There was no showing that Hughes had the intent or influence to force licensees into taking unwanted licenses by wearing them down with threats of costly litigation. Doody was disturbed by what he believed was infringement. His purpose in recommending and pursuing the licensing program was to gain respect for the patent as well as to gain income. He had no intent to attempt to eliminate competition or to create a monopoly. Thus, this case does not fall within *Otter Tail*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359, where intent was inferred from the nature of the defendant's enforcement litigation against its competitors.

Even if Hughes were to have the requisite anticompetitive or monopolistic intent, by fraud on the Patent Office, by an overall scheme, or by instituting vexatious litigation, Hughes' licensing program had no demonstrated anticompetitive effects on the diode market. There was no evidence concerning the relative earnings of the Hughes Aircraft Corporation from diode royalties, fees and sales. No evidence was presented as to what percentage of all semiconductors or of germanium diode-type semi-conductors was manufactured under the Hughes patent. The testimony as to Hughes' share of market sales varied according to how the market was defined, and was necessarily skewed by the fact that many of Hughes' sales were internal, for use in manufacturing by other branches of the highly diversified corporation. However, between 1956 and 1961, Hughes' share of the market for all semi-conductor devices (diodes and rectifiers) dropped from 12.8% of dollar sales to 2.9%. Its share of the germanium diode and rectifier market, the specialized subgroup in which its patent

was used, dropped from 34.2% to 5.7% during the same period. We find that Hughes did not exercise exclusionary power in either market at the time Transitron entered the 1962 license agreement.

## IV. *HUGHES' CONDUCT DID NOT CONSTITUTE PATENT MISUSE.*

Even if patent misuse were an actionable tort, we find that Transitron has failed to show Hughes' conduct amounted to patent misuse. As with the antitrust allegation, Transitron's claim here is premised entirely on the theory that Hughes obtained its patent fraudulently. If such were the case, Hughes would have committed patent misuse. *Duplan*, 444 F.Supp. at 701–702. However, to prove patent misuse as well as a violation of the federal antitrust laws by means of fraud on the Patent Office, Transitron must provide clear and convincing evidence on the issue of fraud. *Krenzer v. Stoffel*, 551 F.2d 1214, 1217 (Cust. & Pat. App.1977). If Hughes made misrepresentations to the Patent Office which were honest, albeit negligent mistakes or failures to disclose, such conduct might affect Hughes' rights to royalties, but would not support awarding damages to Transitron.

As with its antitrust claim, plaintiff has failed to plead or prove any form of patent misuse other than fraud on the Patent Office, such as coercive licensing terms and tactics or anticompetitive market control. Mere good faith enforcement of a patent later found to be invalid does not constitute patent misuse. *Troxel I*, 465 F.2d at 1255.

Cases in which patent misuse has been a bar to a licensor's suit involved much more culpable conduct by the licensor than Hughes' failure to inform the Patent Office of improved production methods and its failure to give timely disclosure of the British Patent of Addition in the *General Instrument* case. None of the classic forms of patent misuse described above—overbroad grant-backs, tie-ins of unwanted or unpatentable subject matter, extending the effect of a patent beyond 17 years, price-fix-

ing, or percentage royalties not based on actual use of the patent—is involved here.

The *Duplan* case presents the factual context most similar to the present action. There, one aspect of the patentee's allegedly offensive conduct was its failure to disclose to the Patent Office previously issued French patents upon which its pending United States patent might read. There, however, the patentee's internal documents demonstrated its awareness that relevant foreign patents existed and its conscious decision not to disclose them. Moreover, the Court did not find patent misuse solely in that failure to disclose, but in the "totality of [the patentee's] conduct in respect of their licensing program . . .[.]" 444 F.Supp. at 695.

## V. TRANSITRON KNOWINGLY MADE MISREPRESENTATIONS TO HUGHES CONCERNING ITS INFRINGING PRODUCTION.

On July 1, 1962 Hughes and Transitron executed a five-year non-exclusive license agreement at a 1% royalty rate. On October 1, 1962, Transitron notified Hughes that it had changed its manufacturing process to an "etched lead" construction so that its diodes no longer fell within the patent. From January 15, 1963 until May 5, 1966, Transitron verified quarterly to Hughes that it was manufacturing no diodes under the license. However, by May 17, 1966, Hughes had determined that Transitron was manufacturing infringing diodes and demanded back royalties.

Transitron actually resumed production of the patented diode around October, 1964. Until November 25, 1964, its quarterly reports to Hughes were under the name of Transitron's comptroller. Thereafter, they were under the name of David Bakalar, Transitron's chief executive officer. Early in the 1966 settlement and license negotiations, Transitron's attorney admitted only that "a limited quantity of diodes have been made in the recent past that we believe you may conclude come within the scope of the license agreement." He later confirmed Hughes' assertion that infringing manufac-

ture was resumed in 1964. He also represented that the decision to resume was made inadvertently, by a lower level Transitron employee, without Bakalar's knowledge, and that it would be extremely difficult to determine the exact amount due because of Transitron's inventory system.

Hughes now contends that, unknown to it in 1966, Transitron's infringing sales were substantial in 1964, 1965 and 1966, that Bakalar approved the decision to resume infringing production, and that he knew the exact amount of royalties due. Windsor Hunter, Transitron's chief manufacturing executive, testified that his engineering department recommended the production change, and that he discussed it orally with Bakalar, who approved it because of lower material costs and better yield rates with the Hughes construction. Bakalar testified that he had no knowledge of the change from the etched lead to the Hughes construction, and that it was worth the substantially higher cost of producing non-infringing diodes for him to avoid an audit of Transitron by Hughes under the 1962 license.

 It is the function of the trial judge sitting as a trier of fact to assess the credibility of witnesses and to resolve conflicts in the evidence. The Court accepts Hunter's testimony that Bakalar approved the change to the Hughes diode. Bakalar's attempt to exculpate Transitron by attributing the production change to a low level employee was a fraudulent misrepresentation. I also find that Bakalar was aware that Transitron had been manufacturing substantial amounts of Hughes diodes since 1964 and was responsible, under agency principles, for his counsel's statements concerning the amount and duration of infringing production.

However, Transitron's statements concerning the difficulty of performing an inventory were not false or willfully misleading. Although Bakalar received from Hunter a tabulation of royalties due between 1964 and 1966, it is not clear that the tabulations were more accurate than his counsel represented was possible. Insuffi-

cient evidence concerning possible methods of determining infringing production from inventory or sales records was submitted for us to discern the truth or falsity of counsel's representations in that respect.[9] No audit was done, despite Hughes' right to one.

## VI. HUGHES DID NOT RELY ON TRANSITRON'S MISREPRESENTATIONS.

Although Hughes may have accepted all of Transitron's representations during the 1966 negotiations, I find they were not germane to Hughes' decision to accept the settlement. Hughes was not deeply concerned with the amount of money it would receive for back royalties. The primary consideration received by Hughes in the settlement was to gain respect for the patent, to avoid litigation, to demonstrate a tough stance to other licensees, and to obtain a license under a related patent held by Transitron.

■ Hughes' Director of Patents, David Doody, was involved directly in the negotiations. The Court found Doody to be a credible witness. He was direct, helpful and non-evasive. Doody instituted the licensing program to gain income from all of Hughes' patents, although the North-Carman patent was not considered for licensing at the outset. He was disturbed when he learned of Transitron's infringement, but he did not insist on the audit to which he was entitled and which would have provided accurate figures. He could not say why he accepted the settlement of $150,000. Settlement discussions began immediately after Hughes charged Transitron with infringement and lasted almost six months. Doody knew the figures were not definite. Hughes also received a royalty free license under a Transitron (Bakalar) patent relating to a gold-bonded germanium diode. This patent had been the subject of infringement charges between the parties some years earlier, but those charges were not pursued. This settlement ended that controversy as well. We can only conclude that Doody was satisfied with the entire settlement without an accurate audit, and that Transitron's statements concerning infringing production were not material to his decision to accept the settlement.

■ For the foregoing reasons, we cannot conclude that Transitron made any misrepresentation which was both fraudulent and material during the settlement negotiations. Hughes has failed to prove that it reasonably relied upon these misrepresentations and therefore, none of Transitron's misrepresentations is actionable. Our conclusion is supported by the difficulty we would have in determining damages, since in accepting the settlement offer, Hughes was relieved of the costs of performing an audit, of defending Transitron's pending infringement suit against it or paying royalties, and of bringing a suit against Transitron where the validity of the Hughes patent might well have been put in issue.

## VII. HUGHES FAILED TO FULFILL ITS OBLIGATIONS TO THE PATENT OFFICE.

While Hughes' conduct during the prosecution of claims 60 and 61 did not amount to fraud on the Patent Office or even patent misuse, it fell short of the duty a patent applicant has to the Patent Office. Hughes failed to reveal the additional refinements to the original specifications as they developed. It should have drafted its amending claims more narrowly. Specifically, it did not disclose that the one piece lead had replaced the two piece lead that was butt-welded together. It did not disclose that the lead ended inside the chamber, or that the crystal was supported by the wire. These were departures from the original invention. Hughes failed initially to specify the dimensions later found to be critical. These failures, while not willful concealment, demonstrated a lack of care, clarity, and specificity for which we cannot, in fairness, allow Hughes to recover.

---

**9.** Even the Court's direct inquiry to the witness as to a means of ascertaining production from inventory or raw material control failed to reveal any possibility of definitive figures.

Although a patent applicant need not "list out the full spectrum of his knowledge to establish [its] bona fides," *Eli Lilly & Company v. Generix Drug Sales, Inc.*, 460 F.2d 1096, 1102–3 (5th Cir. 1972), it may not deliberately fail to disclose material information such as a possible prior use. *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933). A heavy burden of disclosure is imposed on an applicant in dealing with the Patent Office because a patent is a "special privilege" which "is affected with a public interest." *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 816, 65 S.Ct. 993, 998, 89 L.Ed. 1381 (1945).

Hughes has admitted that it drafted its claims in the broadest terms that the Patent Office would allow. This tactic does not always comport with the nature of the patent system. A patent is a privilege granted by the government in order to promote inventorship and free competition:

> Letters patent are not to be regarded as monopolies, created by the executive authority at the expense and to the prejudice of all the community except the persons therein named as patentees, but as public franchises granted to the inventors of new and useful improvements for the purpose of securing to them, as such inventors, for the limited terms therein mentioned, the exclusive right and liberty to make and use and vend to others to be used their own inventions, as tending to promote the progress of science and the useful arts, and as matter of compensation to the inventors for their labor, toil, and expense in making the inventions, and reducing the same to practice for the public benefit, as contemplated by the Constitution and sanctioned by the laws of Congress.

*Seymour v. Osbourne*, 11 Wall. 516, 78 U.S. 516, 533–34, 20 L.Ed. 33 (1870).

Hughes was granted its exclusive patent rights under an administrative process designed to further these public policies. The Patent Office was established to protect the public interest in the proper administration of the patent system. Hughes has not fulfilled its duty of care and completeness to the Patent Office. Thus, it has abused the patent process under which it claims its exclusive privilege. The Patent Office has been criticized for the ease with which it grants patents later found to be invalid. *Duplan*, 444 F.Supp. at 771. We cannot say whether such criticism is justified, but we can understand the Patent Office's difficulty in processing the underlying application in this case, which contained 106 colorable claims, extensive correspondence, data and personal interviews. The patent examiner must act as a judge in determining patentability, but the expert and resourceful applicant is not opposed as a party litigant in its application. The patent system is not an adversary process. Without an opposing litigant, such as a potential infringer, the Patent Office must rely on the applicant to comply with the spirit of the statute and rules governing the patent procedure. The burden is on the patent lawyer to provide care, candor, clarity and specificity in his dealings with the Patent Office. In this case, Hughes' claims were excessive, cumulative and overly broad, obfuscating the differences between claim 60 and the initial claims. Under these circumstances, we do not believe we would do substantial justice if we allowed Hughes to recover further royalties.

We also consider in this general finding that, in addition to its failure to fulfill its duty to the Patent Office, Hughes subsequently failed to make a timely disclosure of its British Patent of Addition to the courts. Its failure was attributed to its inability to maintain accurate records. Had Hughes paid more attention to its internal system, it would have made a timely disclosure of the BPA. It is likely that the patent would then have been challenged by infringers at a much earlier date and Hughes would have received royalties for a much shorter period of time from virtually all of the manufacturers in the large DO–7 industry. While we have concluded that its failure to disclose the BPA was not a willful concealment, we cannot condone its negli-

gent conduct by allowing it to recover yet more royalties under patent claims which should never have been allowed.

## Conclusions of Law

### Jurisdiction

1. This Court has jurisdiction over the subject matter and parties for the antitrust claim under 15 U.S.C. §§ 1, 2, and 15 pursuant to 28 U.S.C. § 1337. We exercise pendent jurisdiction over the plaintiff's tort and contract claims, and the defendant's counterclaim, which sounds in contract. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Jurisdiction also exists based on diversity of citizenship. 28 U.S.C. § 1332.

### Plaintiff's Antitrust Claim

2. The plaintiff has failed to meet its burden of proving by clear and convincing evidence that Hughes committed fraud on the Patent Office. *Johnson & Johnson*, 436 F.Supp. at 732.

3. The plaintiff has failed to prove by a preponderance of the evidence that Hughes violated Section 184 of the Invention Secrecy Act in failing to obtain a license for filing the British Patent of Addition. 35 U.S.C. § 184.

4. The plaintiff has failed to prove Hughes' licenses were agreements in restraint of trade. 15 U.S.C. § 1.

5. The plaintiff has failed to prove Hughes intended to monopolize the germanium diode, crystal diode or semi-conductor industry. 15 U.S.C. § 2.

6. The plaintiff has failed to prove Hughes exercised exclusionary market power in the germanium diode, crystal diode or semi-conductor industry. 15 U.S.C. § 2.

7. The plaintiff has failed to define the relevant market for purposes of the Sherman Act. 15 U.S.C. § 2.

### Plaintiff's Tort Claim

8. Patent misuse alone does not constitute an actionable tort. *See* text at note 2, *supra.*

9. The plaintiff has failed to prove by clear and convincing evidence that Hughes' conduct in the prosecution of its patent application was fraudulent. *Krenzer*, 551 F.2d at 1217.

10. The plaintiff has failed to prove by a preponderance of the evidence that Hughes' conduct in the enforcement of its patent constituted patent misuse.

### Plaintiff's Contract Claims

11. The plaintiff has failed to prove by clear and convincing evidence that Hughes made any material false and misleading representation in inducing Transitron to enter the 1962 and 1966 license agreements. *Sanborn*, 2 Story at 485.

12. The plaintiff has failed to prove by a preponderance of the evidence that it relied on Hughes' representations to the Patent Office contained in the file wrapper when it entered the license agreements. *Pepsi-Cola Metropolitan Bottling*, 345 F.2d at 622.

13. A mutual mistake of fact as to the validity of a patent does not provide grounds for rescission of a license agreement and restitution of royalties under the patent. *St. Regis Paper*, 552 F.2d 309.

### Defendant's Counterclaim

14. The defendant is not barred from asserting a claim for royalties due before its patent was found to be invalid. *Troxell II*, 489 F.2d 968.

15. The defendant has failed to make the requisite showing by a preponderance of the evidence that it relied on Transitron's misrepresentations in entering the 1966 settlement agreement. *Pepsi-Cola Metropolitan Bottling*, 345 F.2d at 622.

16. Transitron's performance under the 1966 settlement agreement constituted accord and satisfaction for all royalties due Hughes under the 1962 license agreement. *Rust Engineering*, 401 F.Supp. at 333.

## Conclusion

The foregoing constitutes our findings of fact and conclusions of law made pursuant to Fed.R.Civ.P. 52(a). In accordance therewith, judgment is to be entered for the defendant Hughes Aircraft Company in all counts of the plaintiff's complaint and judg-

ment is to be entered for the plaintiff Transitron Electronic Corporation in the defendant's counterclaim.

SO ORDERED.