**BARRY WRIGHT CORP.**
vs.
**ITT GRINNELL CORP. &**
**PACIFIC SCIENTIFIC CORP.**

Civ. A. No. 78-485-S

United States District Court
D. Massachusetts

February 26, 1981

Donald Gould for the plaintiff.
John Nadas, John Curtin for the defend-
ant.

## MEMORANDUM AND ORDER

SKINNER, D.J.  This action is brought
pursuant to 15 U.S.C. § 15 to recover
damages for alleged violations of the anti-
trust laws. Plaintiff claims that defendants
have violated Sections 1 and 2 of the
Sherman Act (15 U.S.C. § § 1 and 2),
Sections 2(a) and 2(f) of the Clayton Act,
as amended by the Robinson-Patman Act
(15 U.S.C. § § 13(a) and 13(f) ) and Section
3 of the Clayton Act (15 U.S.C. § 14).

Plaintiff also alleges an action in contract
against one defendant, ITT Grinnell Corp.
(ITT), and in tort against both defendants.
In addition, plaintiff asserts violations of
Mass. Gen. Laws c.93A, § § 2 and 11,
which prohibit unfair competition. This
Court's jurisdiction over the contract, tort,
and Chapter 93A claims is pendent to its
jurisdiction over the antitrust claims.

Defendants, ITT and Pacific Scientific Corp. (Pacific), have filed a, motion for partial summary judgment as to the antitrust claims in counts 1, 2, 3, 4, 5 and 6. In opposition to this motion, the plaintiff Barry Wright Corp. (Barry) has submitted 251 documents. Pacific seeks to strike several of these documents.

## I. Motion to Strike

Fed. R. Civ. P. 56(e) requires that a party opposing summary judgment set forth facts which "would be admissible in evidence" indicating that there is a genuine issue for trial. **Hahn v. Sargent,** 523 F.2d 461, 466 (1st Cir. 1975), **cert. denied,** 425 U.S. 904. Exhibits which have not been properly authenticated cannot be used. **Hamilton v. Keystone Tankship Corp.,** 539 F.2d 684, 686 (9th Cir. 1976); 10 Wright and Miller, **Federal Practice and Procedure,** § 2722 at pp. 486-87 (1973).

Pacific claims that 25 of the exhibits relied upon in Barry's brief have not been properly authenticated. In particular, Pacific argues that exhibits 18, 34, 35, 44, 52, 87, 108, 118, 135, 137, 141, 187, 188 and 208 have not been identified by anyone during deposition testimony. Pacific also contends that exhibits 43, 63, 66, 88, 115, 116, 125, 142, 146 and 187 have been significantly impeached by various deponents. Finally, Pacific asserts that a document numbered 23301, which is referred to in Appendix B of Barry's brief in opposition to defendant's motion for summary judgment, has not been filed with this Court.

The impeachment of exhibits 43, 63, 66, 88, 115, 116, 125, 142, 146 and 187 by deponents does not render these documents inadmissible. The deponents' testimony would affect only the weight to be accorded these exhibits by fact-finders at a trial. Exhibits 18, 52, 87, 118, 137 and 141 have been identified by deponents and should not be stricken.

In regard to exhibit 188, a document containing nine columns of hand-written figures, a deponent has testified that the first eight columns of numbers were in his handwriting. Consequently, only the 9th column, titled "Discount %", should be stricken.

Exhibit 34 is a memorandum from Mr. Feingold, an employee of ITT, to Mr. Sherbourne, another employee of ITT. The memorandum is stamped "General Manager's Office — Feb. 10[sic] 1975 — Pipe Hanger Division". The last page of the memorandum indicates that copies were to be sent to three individuals including Mr. Milman, a vice president of ITT. Mr. Milman has testified during a deposition, however, that he does not recall receiving exhibit 34. There is no other deposition testimony identifying the memorandum.

In my opinion, the lack of testimony identifying exhibit 34 does not preclude its authentication. Rule 901(b)(4) of the Federal Rules of Evidence provides that "appearance, contents, substance, internal patterns or other distinctive characteristics, taken in conjunction with circumstances" may satisfy the requirement of authentication. Since this memorandum is addressed by one employee of ITT to another and bears a stamp already described above, there is sufficient authentication to allow it to be considered in the motion for summary judgment.

This is also true for exhibits 35, 44, 108, 135 and 208. Exhibit 44, a memorandum between two ITT employees on stationery marked "ITT Grinnell Inter Office Correspondence" and stamped "Received — Pipe Hanger Division — Jul. 25, 1975", is sufficiently authenticated. Similarly, exhibit 108, a price quotation on Pacific's stationery which was addressed to ITT, stamped "Received", and produced by ITT, is properly authenticated. Moreover, exhibit 135, a snubber sales report written on Pacific stationery and stamped "received — Nov. 8 [sic] 1976 — PSCO Sales Dept." is authenticated by its contents. I also conclude that exhibits 35 and 208 fulfill the authentication requirements of Fed. R. Evid. 901 because both of these documents were produced from ITT's files and both contain information which a firm would be likely to record in the ordinary course of business.

The final document to be considered is number 23301. This document has never been filed with this court. Accordingly, it cannot be stricken, but reference thereto

will be disregarded.

Accordingly, Pacific's motion to strike is DENIED with respect to exhibits 18, 34, 35, 44, 52, 87, 108, 118, 135, 137, 141, 187, the first eight columns of 188, 208, and document 23301. The motion is AL-LOWED for the ninth column of numbers in exhibit 188 listed under the heading "Discount %".

## II. Summary Judgment

Defendants have moved for partial summary judgment with respect to counts 1, 2, 3, 4, 5 and 6. In determining whether summary judgment is appropriate, the court must examine the record in the light most favorable to the party opposing the motion. **Thyssen Plastik Anger KG v. Induplas, Inc.,** 576 F.2d 400, 401 (1st Cir. 1978), quoting **Hahn v. Sargent,** 523 F.2d 461, 464 (1st Cir. 1975), **cert. denied,** 425 U.S. 904. All parties have had the benefit of exhaustive discovery.

The submission of the parties, viewed in the light most favorable to Barry, warrants the following findings of facts: ITT is a pipe hanger company. A pipe hanger company designs pipe support systems used in nuclear reactors. Part of the pipe support system is a snubber. A snubber is a shock absorbing device which restrains sudden movements of a nuclear reactor's piping system in the event of earthquakes or explosions. ITT sells snubbers, either as part of its pipe hanging apparatus or separately to architectural and engineering firms (A & Es).

Until 1975, ITT supplied its own hydraulic snubbers for all nuclear power plant projects. During the period 1974-1975, however, regulatory agencies and nuclear reactor builders became concerned about leaking fluid in hydraulic snubbers. As a result, the A & Es began to purchase only mechanical snubbers which do not use hydraulic fluids.

ITT, unable to develop a suitable mechanical snubber, purchased snubbers from another company, Pacific. Pacific's share of the snubber market was approximately 80%. In addition to manufacturing mechanical snubbers and selling them to pipe hanger companies such as ITT, Pacific also sells snubbers directly to the A & Es.

On January 30, 1976, ITT entered into a contract with Barry for the development of a mechanical snubber. The ITT-Barry contract consisted of two phases.

The first phase was a development phase which did not bind either party to purchase or sell snubbers. During phase 1, ITT agreed to pay Barry $180,000 for development costs, an additional $54,000 for production tooling, and up to $60,000 for special test equipment.

On August 31, 1976, ITT and Barry agreed to enter into phase 2 of the contract. During this phase, Barry was to develop production capability for six sizes of snubbers by January 28, 1977. ITT was obliged to purchase its requirements of mechanical snubbers from Barry for the next three years, subject to an obligation to purchase at least $9 million but not more than $15 million over the three year period. ITT retained the option to purchase Barry's snubber production facilities at any time during phase 2. Barry agreed not to compete with ITT for five years after such purchase. In addition, while Barry was manufacturing snubbers for ITT, it could not sell mechanical snubbers to anyone else.

Meanwhile, pending the development of Barry's snubbers, ITT purchased all of its mechanical snubbers from Pacific. Pacific was also attempting to sell snubbers directly to the builders of nuclear power plants, in competition with ITT. It had not been successful in securing direct sales contracts, but in May of 1976, it arguably forced ITT to offer an additional discount to at least one customer in order to secure a contract.

In late summer, Stephen J. Toth, who had once been an employee in another division of ITT, became president of Pacific. He met with representatives of ITT and expressed a desire for a healthier relationship between the companies. For a sufficiently large order, he offered ITT discounts of 25% on the four smaller sized snubber and 30% on the larger ones. In September 1976 an agreement was negotiated for $5.7 million of snubbers covering ITT requirements through 1977, but this agreement was cancelled by ITT. On October 20, 1976, ITT gave Pacific a purchase order for its requirements for the first quarter of 1977 in the

amount of $874,000, at standard discounts.

On January 31, ITT informed Barry by letter that it considered the cumulative delays in Barry's development program to be a breach of its contract.

On February 1, 1977, ITT gave Pacific a new blanket purchase order for mechanical snubbers for its proposed requirements through January 31, 1978 in the amount of over $5 million. Pacific granted discounts of 25% and 30%, as previously offered, but imposed a 100% cancellation charge, a considerably more severe cancellation provision than that which had been included in the aborted contract of September 1976.

At a meeting on February 25, 1977, representatives of ITT told an officer of Barry that May 15, 1977 was an absolute deadline for Barry to qualify the first four sizes of snubbers for production. On April 25, 1977, however, a second letter from ITT notified Barry that ITT considered its contract breached and terminated. Negotiations between ITT and Barry concerning the contract dispute continued notwithstanding. ITT proposed that Barry continue the contract, but under an amendment whereby its minimum purchase obligation of $9 million was reduced by the amount of its contracts with pacific of over $5 million. The justification for this reduction was that ITT had been required to look elsewhere for snubbers because of Barry's delays and could only secure a favorable price by buying in large quantities. There is a dispute between the parties concerning the making and acceptance of this offer which cannot be resolved on this motion. In any case, negotiation ceased in early June 1977, and ITT informed Barry that the contract was terminated.

On July 5, 1977, ITT placed a blanket purchase order with Pacific for its requirements for the period February 1, 1978 through December 1, 1978. On July 14, 1977 it placed a similar purchase order for calendar year 1979. Both of these orders were subject to extraordinary discounts and severe cancellation penalties, substantially of the magnitude of those contained in the February 1 contract. There was a price escalation formula which was favorable to ITT.

Pacific did not attempt to bid separately on snubber supply contracts to ITT customers after September 1976. After it had acquired the ITT contracts, Pacific supplied approximately 95% of mechanical snubbers sold in the United States.

At a meeting of the Society of Security Analysis in New York in 1977, Mr. Toth, president of Pacific, made the following answer to a question concerning Pacific's competitors in the snubber business:

TOTH: Shock arrestor. Well, our major competitors are our major customers. We traditionally sell the shock arrestors to the pipe hanger people and for instance, there's a division of ITT, Grinnell up in Providence, called the Pipe Hanger Division, that probably has a major share of the market and they make hydraulic shock arrestors. So we have had to sell our product to them when at the same time they were trying to beat us out with the sale of their hydraulic units. And that's the reason for our selling directly to the utilities. We went right to the end user who just edicted [sic] to the selling engineers that they wanted a mechanical shock arrestor versus a hydraulic. So Grinnell has had to buy our unit. We really were heading on a collision course with this major customer up until last fall when we got together with them and they decided not to offer their unit nor to get into the design of a mechanical unit. So we now have all of their business. We have a contract with them for the next two years. That amounted to a $16 million order that we got this past summer and it is a major part of our backlog now and they are our friends now.

In October 1977, an ITT internal memorandum seeking approval from corporate headquarters for the cancellation of the ITT-Barry contract contained the following paragraph:

During the course of developing the product, Barry Wright Corp. (our partners in the joint venture) exercised their option to increase production costs due to escalation. At the same time our competitors, who have a similar device

qualified and in production, have heard of our intent to develop our own device, offered us more favorable terms for both cost and schedules. With these new terms, the cost of developing our own product became marginal, and the project was cancelled.

## Count 1

Count 1 of Barry's complaint alleges that ITT and Pacific agreed not to compete with each other in the manufacture and sale of pipe snubbers and, in furtherance of this agreement, arranged that ITT's contract with Barry would be terminated. After reviewing Barry's affidavits, depositions and documents, I conclude that Barry has presented evidence from which a conspiracy between ITT and Pacific not to compete and concomitantly to terminate Barry can be inferred. In so concluding, I view the record in the light most favorable to Barry and indulge in all inferences favorable to Barry. Hahn v. Sargent, 523 F.2d at 464. An illegal conspiracy is rarely explicit. Ferguson v. Omnimedia, Inc., 469 F.2d 194, 198 (1st Cir. 1972); Zaccagnini v. Morris, 478 F.Supp. 1199, 1203 (D. Mass. 1979).

Pacific and ITT contend, however, that Barry does not have standing to complain of their alleged conspiracy to cease competing with each other. They argue that a lessening of competition resulting from a conspiracy would affect only snubber buyers, either pipe hanger companies or A & Es, and not Barry.

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that "(a)ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . ." In determining whether a particular plaintiff has standing, the Court of Appeals for the First Circuit appears to have adopted the "target area" test. See, Engine Specialties, Inc. v. Bombardier Ltd., 605 F.2d 1, 17-18 (citing cases applying the "target area" test). The target area test provides that:

> In order to state a cause of action under the antitrust laws a plaintiff must show . . . that he is within the area of the economy which is endangered by a breakdown of competitive conditions in a particular industry.

II Areeda & Turner, Antitrust Law ¶ 334d (1978), quoting Conference of Studio Unions v. Loew's, Inc., 193 F.2d 51, 54-55 (9th Cir. 1951), cert. denied, 342 U.S. 919 (1952).

A plaintiff has standing to recover for injuries resulting from the antitrust violations of his competitor, II Areeda & Turner, Antitrust Law ¶ 340a, since the plaintiff would be within the endangered area of the economy. The facts support the inference that Barry was Pacific's competitor. Barry's contract called for it to manufacture snubbers for ITT which ITT would then sell to its customers. These customers, in a competitive market, could also be solicited by Pacific. Professors Areeda and Turner have observed that in such situations, where a defendant sells directly to consumers while the plaintiff, manufacturing the same product, sells to dealers who then sell to consumers, "the two manufacturers are competitors in every relevant sense." II Areeda & Turner, supra at ¶ 340b. Accordingly, Barry has standing to complain that Pacific and ITT have agreed not to compete in the mechanical snubber market.

Pacific and ITT also argue, however, that Barry has not suffered the antitrust injury required to assert an antitrust claim. Antitrust injury required to assert an antitrust claim. Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).

In Engine Specialties, Inc. v. Bombardier Ltd., 605 F.2d 9 (1st Cir. 1979), cert. denied, _____ U.S. _____, 100 S.Ct. 2964 (1980), the Court of Appeals determined that the plaintiff had suffered antitrust injury in circumstances which resemble the facts of this case. There, Agrati, a manufacturer of minicycles, conspired with a potential manufacturer, Bombardier, to divide the minicycle market in North America. Bombardier, a large firm, was considering entering the minicycle market as a manufacturer. It used its position as a strong potential competitor of Agrati to

coerce Agrati into appointing Bombardier as Agrati's exclusive dealer in North America. As a result of granting an exclusive dealership to Bombardier, Agrati terminated its former distributor, Engine Specialties, Inc. (ESI), claiming that ESI had breached its contract with Agrati.

The Court of Appeals noted that the termination of ESI was part of a **quid pro quo:**

Agrati would surrender its current dealership with ESI in exchange for the promise of no competition from Bombardier and Bombardier would exchange its ability to enter the market against Agrati in exchange for the exclusive dealership as well as a promise of no competition from Agrati.

605 F.2d at 15.

The Court held that the resulting exclusion of ESI from the market for the particular brand of minicycle was antitrust injury entitling ESI to damages.

The same principles appear to apply to the facts alleged by Barry. The facts support the inference that Barry is the victim of a market allocation scheme between ITT and Pacific. Barry, a potential manufacturer, was excluded from the market as the result of an agreement between a manufacturer and a distributor not to compete.

The defendants' motion for summary judgment as to Count 1 is DENIED.

## Count 2

In Count 2, Barry alleges that ITT has entered into a conspiracy with other suppliers of pipe hangers ("the club") to fix prices for completed pipe hanger installation, including snubbers. This is alleged to somehow relate to the ITT-Pacific requirements contracts, and the closing out of Barry, because ITT is acting as a stockpiler of snubbers for the club. It is extremely doubtful that Barry would have standing to complain of such an agreement. See, **Reading Industries, Inc. v. Kinnecott Copper Corp.**, 1980-2 Trade Cases ¶ 63, 559 p. 79, 978 (2d Cir. 1980). No time need be spent on that inquiry, however, since the material offered by Barry in opposition to the motion for summary judgment consists of second-hand speculation, unsupported opinion and conjecture.

The defendants' motion for summary judgment is ALLOWED as to Count 2.

## Count 3

Count 3 of Barry's amended complaint alleges that ITT and Pacific entered into a requirements contract in violation of Section 3 of the Clayton Act and Section 1 of the Sherman Act. Barry's allegation refers to contracts entered into by ITT and Pacific in which ITT allegedly agreed to purchase its 1977, 1978 and 1979 requirements.

In response to this allegation, Pacific argues that the 1977, 1978 and 1979 purchase contracts did not violate Section 3 of the Clayton Act and Section 1 of the Sherman Act because they did not require ITT to purchase all of its snubber requirements from Pacific.

It is not necessary that explicit terms of a contract indicate an exclusive dealing arrangement; such an arrangement may be inferred from all the circumstances. **Tampa Electric Co. v. Nashville Coal Co.**, 365 U.S. 320, 324-327 (1961); **Perington Wholesale, Inc. v. Burger King Corp.**, 1979-2 Trade Cases ¶ 62,986 at p. 79,606 (10th Cir. 1979); **McElhenney Co. v. Western Auto Supply Co.**, 269 F.2d 332, 338 (4th Cir. 1959). The evidence would support a finding that ITT's purchase obligation was in fact in excess of its actual requirements and thus warrant a conclusion that the 1977, 1978 and 1979 contracts were requirements contracts and that they had an anti-competitive effect.

ITT and Pacific contend that Barry cannot claim to have been injured by the 1977, 1978 and 1979 contracts because it was not foreclosed by these contracts. The adverse competitive effect of a requirements contract occurs only if it forecloses a substantial part of a market to competitors. **Tampa Electric Co. v. Nashville Co.**, 365 U.S. at 329 (1960). The defendants argue that the 1977 ITT-Pacific contract did not foreclose Barry from the snubber market because Barry was incapable of manufacturing snubbers in 1977. There is a genuine dispute as to this material fact, however, precluding summary judgment.

The defendants also argue that the 1978 and 1979 ITT-Pacific contracts did not

foreclose Barry from the snubber market because ITT, before entering into the 1978 and 1979 contracts with Pacific, had offered to purchase $3.6 million of snubbers from Barry, and Barry had rejected this offer. Barry has provided affidavits written by its officers, however, that state that Barry never made a "final rejection" of the offer. Since there is a dispute of fact as to whether Barry had finally rejected the ITT offer, this issue cannot be resolved by a motion for summary judgment.

Lastly, Pacific and ITT contend that after ITT contracted with Pacific, Barry made no further attempt to solicit orders from ITT. They assert that Barry's failure to sell to ITT was consequently due to Barry's own choice rather than to Barry having been foreclosed from the market by the ITT-Pacific contracts. Viewing the evidence in a light favorable to Barry, a trier of fact might properly conclude that Barry was acting reasonably when it did not attempt to solicit orders from ITT after ITT had terminated its contract with it.

Accordingly, the motion for summary judgment as to count 3 is DENIED.

## Counts 4 and 5

Count 4 of Barry's amended complaint charges Pacific with selling mechanical snubbers to ITT at prices lower than those charged to Pacific's other customers, in violation of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a). Count 5 charges ITT with knowingly inducing and utilizing the allegedly discriminatory prices, in violation of Section 2(f) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(f).

Responding to these charges, Pacific claims that Barry has failed to establish a prima facie case under § 2(a) of the Clayton Act. ITT argues that because Barry's case against Pacific is fatally defective, the plaintiff has necessarily failed in its claim against ITT under § 2(f) of the Clayton Act. Under Section 2(f), "a buyer cannot be liable if a prima facie case could not be established against a seller or if the seller has an affirmative defense." **Great A&P Tea Co. v. FTC**, 440 U.S. 69, 76 (1979).

Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), states:

[I]t shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce. ...

In support of their motions for summary judgment, defendants contend that price discrimination has not occurred. Pacific asserts that it has offered price discounts to one other pipe hanger firm similar to the discounts given to ITT.

The invitation to two pipe hanger companies, ITT and NPS, to participate in price discounts does not alter the fact that there was a differential between the prices paid by these two companies and the prices paid by the rest of the industry. In FTC v. **Anheuser-Busch, Inc.**, 363 U.S. 536, 550 (1959), the Court stated that "it is only by equating price discrimination with price differentiation that § 2(a) can be administered as Congress intended." The act of selling an identical product at a different price to different purchasers is discrimination within the meaning of § 2(a) of the Robinson-Patman Act.[1] Id. at 549-550.

Defendants argue that they are nevertheless entitled to summary judgment because, assuming that price discrimination has occurred, it has not lessened competition. Pacific asserts that Barry's contract prices for snubbers were lower than Pacific's in 31 of 36 instances and, therefore, no injury to competition could have resulted. In **Utah Pie Co. v. Continental Baking Co.**, 386 U.S. 684, 690 (1967), the Court upheld a finding of a violation of the Robinson-Patman Act although the prices charged by the violators were higher than those of the plaintiff-competitor. The Court observed that there had been an injury to competition because the defendant's activities had con-

---

[1] In the absence of various economically supportable justifications such as quantity discounts, discussed infra.

tributed to the rapid decline of prices in the relevant market during the period covered by the suit. **Id.** The Supreme Court has observed that there is an obvious competitive injury where discrimination has been employed with the hope of immediate destruction of a particular competitor. **Id.** at 702.

The defendants' second reason for asserting that there has not been an injury to competition is that Pacific's prices were not below marginal cost or average variable cost. Courts, in seeking to determine whether price discriminations might injure competition, have relied heavily on the existence of predatory intent. **Utah Pie Co. v. Continental Baking Co.,** 386 U.S. at 702; Kintner, A Robinson-Patman Primer at 127 (1979). A price reduction below cost tends to establish a predatory intent. **FTC v. Anheuser-Busch, Inc.,** 363 U.S. at 552.

Defendants contend that the only way to prove predatory intent and the resulting possibility of harm to competition is by showing that the firm's pricing is below the marginal or average variable cost of producing the unit sold. This thesis was first advanced by Professors Areeda and Turner in **Predatory Practices under Section 2 of the Sherman Act,** 88 Harv. L. Rev. 697 (1975), and has been adopted by several courts. See, e.g., **Janich Brothers, Inc. v. American Distilling Co.,** 570 F.2d 848, 855 (9th Cir. 1977), cert. denied, 439 U.S. 829; **International Air Industries, Inc. v. American Excelsior Co.,** 517 F.2d 714, 724 (5th Cir. 1975), cert. denied, 424 U.S. 943 (1976). This view is not universally accepted, however. See, **Pacific Engineering and Production Co. of Nevada v. Kerr-McGee Corp.,** 551 F.2d 790, 798 (10th Cir.), cert. denied, 434 U.S. 879 (1977); **Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,** 615 F.2d 427, 432 (7th Cir. 1980). In both of these cases, the courts, while recognizing the usefulness of marginal or average variable cost for determining the presence of predatory conduct, stated that they would be willing to consider other factors in determining whether a defendant's conduct had been anticompetitive.

Indeed, in **Utah Pie Co. v. Continental Baking Co., supra,** the Court upheld a verdict against one defendant, Pet Milk Co., even though there had been no finding that Pet Milk's prices were below cost.[2] The Court observed that there were several facts from which the jury could have concluded that Pet Milk Co. possessed predatory intent to injure the plaintiff, Utah Pie. "As an initial matter", the Court reasoned, "the jury could have concluded that Pet's discriminatory pricing was aimed at Utah Pie; Pet's own management . . . identified Utah Pie; as an 'unfavorable factor', one which 'd[u]g holes in our operation' and posed a constant 'check' on Utah's performance. . . .'" Id. at 696-97. Moreover, the Court noted, Pet had sent an industrial spy into Utah Pie's plant. **Id.**

In my opinion, **Utah Pie** indicates that several factors other than below-cost pricing may indicate the presence of predatory intent. The use of discriminatory pricing to induce an illegal requirements contract and to induce a contract not to compete warrants an inference of predatory intent.

Lastly, Pacific argues that it has a prima facie defense to Barry's claim that it violated the Robinson-Patman Act. Section 2(a) of the Act, 15 U.S.C. § 13(a) states:

[N]othing herein contained shall prevent differentials which make only due allowance for differences on the cost of manufacture, sale, or delivery resulting from the differing methods or qualities in which such commodities are to such purchasers sold or delivered.

Pacific asserts that ITT's orders doubled its sales volumes. This increase, Pacific contends, made it obvious to Pacific officers that cost savings would result, allowing greater discounts to ITT.

The burden of proving a cost justification for discriminatory pricing is on Pacific. **United States v. Borden Co.,** 370 U.S. 460, 467 (1961). The cost data used to

---

[2] There was, however, evidence indicating that Pet Milk had suffered "substantial losses" during the period of price discriminating. 386 U.S. at 697. The Court observed:

It would not have been an irrational step if the jury concluded that there was a relationship between price and the losses.

Id.

justify discriminatory pricing must be specific enough to establish that different treatment of customers was warranted. 370 U.S. at 468-69.

The cost data presented by Pacific with its motion for summary judgment is not so overwhelming as to preclude a genuine issue of fact, and indeed may not even meet the requirements of **United States v. Borden Co., supra.**

Accordingly, the defendants' motions for summary judgment as to Counts 4 and 5 are DENIED.

### Count 6

In Count 6, Barry alleges that Pacific monopolized, attempted to monopolize and conspired to monopolize the market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Barry also claims that ITT conspired to monopolize in violation of the Sherman Act, Section 2. Section 2 of the Sherman Act provides in part:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce . . . shall be deemed guilty of a felony. . . .

### 1. Monopolization

The offense of monopolization requires two elements: (1) the possession of monopoly power by the defendant in the relevant market, and (2) the willful acquisition or maintenance of monopoly power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. **United States v. Grinnell Corp.**, 384 U.S. 563, 570-71 (1965); **Berkey Photo, Inc. v. Eastman Kodak Co.**, 603 F.2d 263, 274 (2d Cir. 1979), **cert. denied**, 444 U.S. 1093 (1980). For the purpose of this motion for summary judgment, Pacific does not dispute that it possesses monopoly power, nor does it dispute that the market for mechanical snubbers is the relevant product market. Pacific does dispute, however, that it willfully acquired and maintained its monopoly power.

Exclusionary conduct, i.e., conduct designed to foreclose competition, is a form of willful acquisition or maintenance of monopoly power. **United States v. Griffith**, 334 U.S. 100, 107 (1947), **Berkey Photo, Inc. v. Eastman Kodak Co., supra**, 273-75; **United States v. United Shoe Manufacturing Corp.**, 110 F.Supp. 295, 342 (D. Mass. 1953), **aff'd per curiam**, 347 U.S. 521 (1954). Barry contends that there are four activities engaged in by Pacific which qualify as exclusionary conduct. These are: (1) knowing interference with Barry's contract with ITT: (2) extension of preferential discounts to ITT for the sole purpose of inducing ITT to purchase its requirements of mechanical snubbers from Pacific; (3) requiring ITT, as a condition of the granting of the discounts, to commit itself to purchase its entire requirements of mechanical snubbers from Pacific on a non-cancellable basis; and (4) misuse of its patent by threatening patent litigation against any company who purchased a mechanical snubber from anyone other than Pacific.

Pacific contends that there are no facts indicating a Pacific agreement with ITT to foreclose Barry and, therefore, that it is entitled to summary judgment as to the first three activities. The existence of evidence relating to the first three activities — interference with ITT-Barry contract, extension of price discounts to induce an ITT breach of that contract, and an exclusive requirements contract — have previously been discussed in this memorandum. I have already concluded that sufficient facts exist from which it is permissible to infer the occurrence of these activities.

Pacific also argues that there are insufficient facts to indicate that it misused its patent by threatening patent litigation. Pacific contends that threats of a patent infringement suit are not an antitrust violation if the defendant believed in good faith that its patent claims were valid. See, **United States v. United Shoe Machinery Corp., supra** at 333; **Transition Electronic Corp. v. Hughes Aircraft Co.**, 487 F.Supp. 885, 904 (D. Mass. 1980). There is evidence, however, which suggests that Pacific's alleged threats of patent litigation were made in bad faith. This is particularly true where these threats were coupled with other

alleged exclusionary activities. See, **George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,** 424 F.2d 25, 35-36 (1st Cir. 1970).

Pacific's second theory is that there is no evidence that its alleged patent abuse has had any anticompetitive effect on Barry. Pacific refers to the testimony of a Barry official that Pacific's threats did not inhibit Barry's snubber development. There is justification for inferring from the facts and circumstances of this case, though, that Pacific's alleged threats could have encouraged ITT to terminate Barry. There is sufficient indication, therefore, that the alleged patent abuse had an anticompetitive effect.

### 2. Attempt to Monopolize and Conspiracy to Monpolize

The elements of the offense of attempted monopolization are: (1) a specific intent to monopolize; (2) overt acts in furtherance of the attempt; and (3) a dangerous probability of success in achieving monopoly power. **Swift & Co. v. United States,** 196 U.S. 375, 396 (1905); see, **Time-Picayune Publishing Co. v. United States,** 345 U.S. 594, 626 (1953).

A conspiracy to monopolize is established by proof of a concerted action which is deliberately entered into with the specific intent to accomplish the unlawful result of achieving a monopoly. **American Tobacco Co. v. United States,** 328 U.S. 781, 815 (1945); Sullivan, Antitrust at § 49, p. 132.

In defending against the claim of attempted monopolization Pacific is apparently relying on its argument that it has not committed any exclusionary acts. Since there is evidence indicating that Pacific may have interfered with the ITT-Barry contract, extended discriminatory price discounts, and sought an exclusive requirements contract, this argument fails. With regard to the conspiracy allegation, ITT argues that there are no facts indicating specific intent. ITT asserts that Barry cannot provide any reason why it would have been in ITT's interest to discontinue the development of a snubber with Barry "in order to establish Pacific as a monopolist." The evidence leaves it open to a trier of fact to conclude that the combination of price, reliable delivery and product offered by Pacific convinced ITT management that it was to its advantage to further Pacific's monopolistic position by dropping Barry. The Court of Appeals has observed that "[s]tate of mind is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind." **Hahn v. Sargent, supra** at 468.

The defendants' motions for summary judgment as to Count 6 is accordingly DENIED.

Walter Jay Skinner
United States District Judge